UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

LESTER DAVID CASEY, et al.                                                               PLAINTIFFS

v.                                                                      CIVIL ACTION NO. 3:01CV-413-S

VANDERLANDE INDUSTRIES, INC., et al.                                              DEFENDANTS

## MEMORANDUM OPINION

This matter is before the court on motions of the defendants, Williams Service Group, Inc., formerly Williams Union Boiler, and Cives Steel Company, for summary judgment in this action arising from injuries suffered by the plaintiff, Lester David Casey, while working on the Hub 2000 Project.  The Hub 2000 Project was a project for the construction of a package handling facility for United Parcel Service at Louisville International Airport.  Casey was injured when he fell through an unmarked opening in a steel grate platform onto a concrete floor fifteen to twenty feet below.  It is undisputed that a handrail adjacent to the opening was not installed at the time of the accident.  A safety inspection of the area in issue had been performed the day before the accident, but the uninstalled handrail was not discovered.  Casey filed suit against a number of entities who took part in the Hub 2000 project.  Williams and Cives are the two defendants remaining in the case.

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be

such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Vanderlande Industries, Inc., a general construction contractor, was hired to coordinate a portion of the construction work for the Hub 2000 Project. Vanderlande hired Cives Steel Company to fabricate and erect steel support and maintenance structures for the package conveyor system which was to be installed in an area of the airport property known as Area NE. Cives fabricated or obtained the steel components needed for the project and subcontracted with Williams to erect the structures.

The erection process was regularly monitored and Cives was paid for portions of the work as completed. Cives in turn paid Williams for its labor. After the steel structures were installed, Ziniz installed the conveyor system pursuant to its subcontract with Vanderlande.

Casey was employed by Ziniz to pick up trash and clean the conveyors during the conveyor installation process. On December 22, 2000, some six months after Williams had completed the steel erection and while Ziniz was installing the conveyors, Casey fell through an unmarked opening in a steel grate. There was no handrail installed adjacent to the grate opening. After the accident, the handrail was discovered lying on the steel grate. The steel grate in question had been erected by Williams. The parties do not dispute that the specifications called for a handrail adjacent to the opening. There is a dispute of fact concerning whether Williams failed to install the handrail during the erection process, or whether it had been installed, but was taken down by Ziniz during the process of installing the conveyor system.

Williams contends that it is entitled to summary judgment on the ground that it installed the handrail, and that, having completed its work and left the site, it had no further duty to discover the absence of the handrail.

I

Williams contends that the evidence establishes that it installed the handrail as required by the specifications. It has highlighted testimony which evidences that the procedure for verification of Williams' work involved periodic walkthroughs during which visual inspections were made of Williams' progress in Area NE. As portions of the job were completed, partial payments were made for those verified portions of the work. When the entire job was completed and all of the work verified, Cives and ultimately Williams were paid in full.

Both Robert Bukowski of Williams and Bradley DeBruler of Cives testified that they were confident that the handrail had been installed. Their statements were not based upon actual knowledge that the work had been done or personal observation that the handrail was in place. There was no written record which documented the findings during the walkthroughs. Bukowski testified

> A: The handrail would have already been installed and apparent to me – apparent to me was removed for some other purpose after installation.
>
> Q: Now, explain your answer. You say apparent to you was removed. And what do you base that on?
>
> A: The handrail, by our records, had been installed in June – the previous June. And we – that area had been inspected multiple times through – for the payment process and for quality inspection. And we were, in fact – it was, in fact, acknowledged that that area was complete. And we were – we billed and, in fact, were paid for that work. It is customary or not unusual for subsequent contractors to sometimes remove some steel that we may have erected for the purposes – for other purposes, other equipment installations or piping. That is what I presume happened here.
>
> Q: That's an assumption on your part, correct?
>
> A: It's almost a certainty. It – it – I do have to make an assumption. But from the documents I saw, it is certain that we – we had installed it initially, as was our scope.

Bukowski depo., pgs. 59-60.

In DeBruler's deposition, he was asked the following question and gave the following response:

> Q: ...Mr. Stuckey, who you are not familiar with, has testified in this case, and he testified as to a safety inspection that occurred the day before this accident, and he testified in an area somewhere between these two places where Williams had worked and where Williams was working, that there was a handrail down...That's obviously something that might have been missed in an ongoing progressive inspection of the work being done?
>
> ...is that the type of thing that might have been missed in a – just an ongoing inspection of the work?
>
> A: No, because the conveyor systems are not installed when the walk-throughs are being done, and because the handrails are put up prior to the grating being installed, even the grating crews could identify where a handrail had not been installed. So there is too many checks and balances for the handrail not to have been installed by Williams Union Boiler.

DeBruler depo., pgs. 213-215.

> George Steven Stuckey, Vanderlande's site safety manager, testified as follows:
>
> Q: Were there any handrails lying on the grating nearby at the time of [Casey's] fall?
>
> A: Yes.
>
> Q: Those were handrails that had not been installed at the time of his fall?
>
> A: My opinion is that they had been installed previously and taken down.
>
> Q: When you say in your opinion, what do you base that on?
>
> A: I haven't actually looked at the – and I'm just saying this. Our maintenance platforms are installed by the ironworkers, which would have been Cives Steel, Williams Union Boiler. With the coordinators they do a walk-through –
>
> Q: Okay.
>
> A: – when they turn these over to put conveyers [sic] in. So whenever they do the turnover, they don't turn them over to the conveyor installation group until everything's complete, and for that to be complete those handrails would have had to have been up.
>
> Q: That's just the way it's supposed to be; correct?
>
> A: Yeah. Exactly.

Stuckey depo., pgs. 27-28.

> James Todd Taylor, of UPS testified that
>
> A: The handrail itself was initially installed by Williams Union Boiler. The grating areas that were culled out on the drawing were installed by Williams Union Boiler and then the handrail was to have been installed around those open grating areas. Then the conveyor installer, or Ziniz, came along behind them to install the conveyor system itself, the handrail was removed to allow for installation of the conveyors and then should have been reinstalled in any openings by Ziniz...
>
> That was the agreed-upon method per the contractors on site...

Taylor depo., pgs. 17, 20.

The only evidence Casey has offered to refute Williams' evidence that the handrail was installed was the fact that the railing was down six months later at the time of the accident. With the passage of six months and the subsequent construction of the conveyors by Ziniz, Casey cannot cast backward and establish that Williams failed to install the handrail based solely upon the fact that the railing was down at the time. Casey has offered nothing to refute the testimony that it was common for handrails to be removed and then reinstalled during installation of the conveyor system. Thus the fact that the handrail was found uninstalled and lying on the grate at the time of Casey's fall establishes no more than the condition of the structure at the time of the accident. While the absence of the handrail suggests the possibility that Williams did not install it, it stands as one of a number of possible explanations. Williams has offered unrefuted testimony that it was customary that handrails were removed by Ziniz. Ziniz was installing the conveyors at the time that the handrail was discovered to be down, and Williams was no longer on the premises. Williams has also offered evidence that because of the verification process for the completion of Williams' work, and because of the checks and balances inherent in the construction process, Williams, Cives, Vanderlande and UPS all believe that Williams installed the handrail as required. Therefore, on the evidence adduced, Casey cannot establish by a preponderance of the evidence; that is, that is more likely true than not true that Williams failed to install it.

II.

Casey contends that Williams owed him a duty to discover the down railing during the safety walkthrough which was conducted the day before the accident.

First, Casey has not come forward with evidence creating a genuine issue of material fact concerning whether Williams participated in the walkthrough. Stuckey's recollection concerning who participated in the walkthrough was admittedly uncertain:

> Q: Okay. So you actually had an inspection of this area the day before the accident. Who was with you at the time of this inspection?
>
> A: I can't remember exactly. It may have been Marino or the safety person with Williams Union Boiler, Scott Duncan, I think maybe at that time; D-U-N-C-A-N.
>
> Q: So Scott Duncan with Union Boiler –
>
> A: Yeah. And Marino, but I can't remember exactly.
>
> Q: Are you sure Marino was with you, or you just don't remember?
>
> A: No. I can't remember. Usually when I walk through, we do the walk-throughs together.
>
> Q: Typically?
>
> A: Yeah. Yeah. I can't even remember if they were with me that day I did the walk-through.

Stuckey depo., pgs. 54-55. However, Williams has produced the affidavit of Scott Duncan who states:

> ...2. I was Safety Manager for Williams Union Boiler at the Hub 2000 Project in Louisville, Kentucky, prior to December 21, 2000.
>
> 3. I was not working for Williams Union Boiler at the UPS Hub 2000 Project at the time of the accident involving a Ziniz employee which I have been told occurred on December 22, 2000. Furthermore, I was not working at the UPS Hub 2000 Project on the day before the accident, December 21, 2000. Therefore, I did not participate in a safety inspection on behalf of Williams Union Boiler at the UPS Hub 2000 Project the day before the accident or after the accident occurred.

Duncan Affidavit, pg. 1.

Duncan has averred that he was not working for Williams Union Boiler at the Hub 2000 Project on December 21, 2000 and did not participate in a safety walkthrough on behalf of Williams on that date. Stuckey testified that it might have been him, but that he could not remember if Duncan was with him on that day. Stuckey's testimony is insufficient to create a genuine issue of material fact concerning Williams' participation in the walkthrough.

Further, were we to accept *arguendo* that a Williams employee participated in the walkthrough, Casey has failed to establish that such participation created an independent duty on the part of Williams to discover the down handrail.

Williams has come forward with evidence establishing that Vanderlande had control over Area NE:

> Q: Mr. Taylor, explain to the Court how the construction area comes under the control of particular contractors as it progresses...
>
> A: The construction began per phase as referenced in the drawing...and it progressed into the core...as Hunt Construction completed their responsibility, which mainly included the walls, roofs, dry-in and all overhead utilities in these areas by contractual scheduled dates or milestone dates, if you will, we were to have provided that area or turned it over, so to speak, to Vanderlande, who at that time would take priority access of that – those areas of the building.
>
> Q: What do you mean by priority access?
>
> A: They were the controlling prime contractor. If Hunt, for example, needed to go back into an area and modify an overhead sprinkler system, they had to do that, make a formal request or [sic] permission from Vanderlande to get back into the area in terms of coordinating the work. And the time frame when Mr. Casey was injured, again, per contract, per schedule, Vanderlande was the primary occupant of the Phase 2 area of the building.
>
> Q: And explain what that means as far as access to that area. I mean, could anybody from UPS just walk in there, anybody from say another contractor just walk into that area?
>
> A: Not – not without an agreement or previous approval through Vanderlande. There were only six or eight, at the most, even UPS project engineers at the time that had the authority or approval to go anywhere on site.

Taylor depo., pgs. 75-76.

- 7 -

The evidence establishes that Vanderlande had priority access to Area NE. Ziniz was on the premises under its subcontract with Vanderlande to install the conveyors. Neither Williams nor Cives were on the premises to perform work, as their steel erection work had already concluded. If indeed Williams and/or Cives participated in a walkthrough, it would necessarily have been with Vanderlande and under Vanderlande's direction. Casey has not come forward with either facts or law which suggest the creation of a duty to Casey under such circumstances. Williams and Cives were not in control of the premises nor performing work on the site pursuant to subcontract. Casey suggests that "the law imposes an obligation upon everyone who attempts to do anything, even gratuitously for another, to exercise some degree of skill and care in the performance of those acts." (Response brief, pg. 18). Such a catch-all argument is insufficient to identify a viable claim relating to the alleged participation by Williams or Cives in a walkthrough on December 21, 2000.

For the reasons set forth herein, the court finds that no genuine issue of material fact exists and Williams is entitled to judgment as a matter of law. In light of the grant of summary judgment in favor of Williams, summary judgment must also be granted in favor of Cives, for whom Williams performed work pursuant to subcontract. No claims for any independent acts by Cives have been made out.

A separate order will be entered this date in accordance with this opinion.